# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| ISAM COTTON | : | No. 22-471 |

## MEMORANDUM

PRATTER, J.                                                                                         OCTOBER 3rd, 2023

"A society in which men recognize no check upon their freedom soon becomes a society where freedom is the possession of only a savage few[.]"[1] Isam Cotton moves to withdraw his guilty plea for possession of a firearm by a felon in light of the decision of the Third Circuit Court of Appeals in *Range v. Attorney General* that held that 18 U.S.C. § 922(g)(1) was unconstitutional as applied to Mr. Range. 69 F.4th 96 (3d Cir. 2023) (en banc). Although "the Government did not carry its burden of showing that our Nation's history and tradition of firearm regulation support[ed] disarming Range," *id.* at 98, here the Government brings forward a historical record replete with firearm regulations applying to those who pose a danger to their brethren, a record spanning from before the very first colonists even landed in Jamestown to our Nation shedding its shackles from Great Britain. Thus, because the Government carries its burden under *Range* and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ----, 142 S. Ct. 2111 (2022), the Court denies Mr. Cotton's motion.

---

[1] Judge Learned Hand, "Spirit of Liberty" Address at the "I Am an American Day" ceremony (May 21, 1944), *in* The Spirit of Liberty: Papers and Addresses of Learned Hand 189, 190 (3d ed. 1960).

1

## BACKGROUND

On November 1, 2022, Mr. Cotton, a previously convicted felon on parole, engaged in a video conference call with an inmate at State Correctional Institution – Coal Township ("SCI"). During that video call, Mr. Cotton was initially inside his residence located at 401 Race Street, Apartment 435, Philadelphia, PA, and then seen operating a white Jeep Grand Cherokee. He also displayed a large stack of cash, suspected narcotics, a handgun, and an AR style rifle. The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") obtained two state search warrants: one for Mr. Cotton's residence and one for the Jeep. On November 8, 2022, members of ATF executed the search warrants, discovering suspected narcotics and over $6,000 in cash in Mr. Cotton's apartment, along with a .40 caliber Glock pistol model 22 with serial number NMR113 and an AR-15 style rifle with no serial number found in his Jeep. The Glock and AR-15 rifle resembled those displayed in the video-call between Mr. Cotton and the SCI inmate.

This was not Mr. Cotton's first interaction with the criminal justice system. On July 21, 2010, Mr. Cotton pled guilty to robbery and possession of an instrument of crime, resulting in an initial sentence of 11.5 to 23 months' imprisonment. After violating his probation, he was re-sentenced to three to six years' confinement. According to the record in that case, Mr. Cotton approached an individual, placed a firearm in the victim's side, stated "this isn't a joke," and demanded and took property from the victim. Furthermore, on August 14, 2013, Mr. Cotton pled guilty to possession of a firearm by a prohibited person, the Pennsylvania equivalent of a felon in possession of a firearm. Mr. Cotton was sentenced to three to six years' imprisonment and was placed on state parole after serving his term of imprisonment.

Moving forward, Mr. Cotton was charged in this matter with two counts: possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1) ("Count One") and possession with the

2

intent to distribute cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) ("Count Two"). On February 8, 2023, Mr. Cotton pled guilty to both counts.

On July 19, 2023, Mr. Cotton filed a Motion to Withdraw Guilty Plea as to Count One. Mr. Cotton now argues that he is legally innocent of Count One because of his Second Amendment right to possess a firearm. Specifically, Mr. Cotton relies on the recent Third Circuit holding in *Range,* where the court found that Section 922(g)(1) violated the Second Amendment as applied to Mr. Range, who had a 25-year-old "felony equivalent" conviction for fraud. Mr. Cotton argues that his ten-year-old conviction for unlawful firearm possession does not fall within this Nation's historical tradition of firearm regulation. In the alternative, he argues that he is legally innocent of Count One because Section 922(g)(1) is unconstitutional on its face.

The Government responds first by maintaining its position that *Range* was wrongly decided, but in the alternative, argues that *Range* is distinguishable from Mr. Cotton's present matter. The Government argues that Mr. Cotton's challenge fails for multiple reasons, including that he did not possess the firearm and ammunition for a legal purpose, that his parole conditions barred him from possessing a firearm, and that the prohibition on his possession is constitutionally permissible under the historical test outlined in *Bruen*.

## LEGAL STANDARD

The Federal Rules of Criminal Procedure permit a defendant to withdraw a guilty plea after the Court has accepted the plea, but before sentencing, if the defendant "can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). That burden falls on the defendant, "and that burden is substantial." *United States v. Jones*, 336 F.3d 245, 252 (3d Cir. 2003). The defendant cannot "withdraw that plea simply at his whim." *Id.* Instead, in determining whether a defendant has met this burden, the district court considers three factors: "(1) whether the defendant asserts his innocence; (2) the strength of the defendant's reasons for withdrawing

that plea; and (3) whether the government would be prejudiced by the withdrawal." *Id.* (citations omitted).

## DISCUSSION

Mr. Cotton primarily relies on the first factor, asserting that the Third Circuit Court of Appeal's en banc ruling in *Range* rendered him *legally* innocent after pleading guilty to Count One. He argues that the felony that previously disqualified him from possessing a firearm, unlawful firearm possession from ten years ago, is not the type of offense that falls within the Nation's historical tradition of firearm regulation.

In *Range*, Mr. Range filed a civil suit in which he averred that Section 922(g)(1) violated the Second Amendment *as applied to him*. 69 F.4th at 99 (emphasis added). Mr. Range tried to purchase a firearm in 1998, but the Pennsylvania instant background check system rejected that purchase after it was discovered that Mr. Range was previously convicted of a Pennsylvania misdemeanor punishable by up to five years' imprisonment. *Id.* at 98–99. Mr. Range's crime dated back to 1995 when he pled guilty to making a false statement to obtain food stamps because he and his wife struggled to raise their three children, earning only $300 a week. *Id.* at 98. At the time of filing his complaint, Mr. Range's single conviction from over 25 years earlier still precluded him from purchasing a firearm. *See id.*

The Third Circuit Court of Appeals first held that Mr. Range was among "the people" protected by the Second Amendment, even though he had a false statement misdemeanor conviction from 1995. *Id.* at 103. In its reasoning, the Third Circuit Court of Appeals rejected the Government's contention that the Second Amendment applied only to "law-abiding, responsible citizens[,]" in part because that description "is as expansive as it is vague." *Id.* at 102. Instead, "the people" "unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 101 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008)).

The Third Circuit Court of Appeals recognized, however, that it was "hardly illogical" "[t]hat individuals with Second Amendment rights may nonetheless be denied possession of a firearm." *Id.* at 102 (quoting *Binderup v. Att'y Gen.*, 836 F.3d 336, 344 (3d Cir. 2016)). The court also agreed with then-Judge Barrett's reasoning that "'all people have the right to keep and bear arms,' though the legislature may constitutionally 'strip certain groups of that right.'" *Id.* (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting).

The Third Circuit Court of Appeals also held that the Government did not fulfill its obligations under *Bruen*. *Id.* at 103 (quoting *Bruen*, 142 S. Ct. at 2130). After analyzing the Government's arguments in *Range*, the Third Circuit Court of Appeals ultimately held that the Government did not carry its burden "show[ing] that the Nation's historical tradition of firearms regulation support[ed] depriving Range of his Second Amendment right to possess a firearm." *Id.* at 106.

Here, the Government concedes that Mr. Cotton "is one of 'the people' protected by the Second Amendment." Doc. No. 23 at 8. The next question is whether Section 922 (g)(1) regulates Second Amendment conduct. *Range*, 69 F.4th at 103. In two simple words: "It does." *Id.* The relevant inquiry, therefore, is whether the Government has carried its burden demonstrating that Mr. Cotton should be deprived of his Second Amendment right consistent with the Nation's historical tradition of firearms regulation. And the Government has met that burden here.

First, the Government has presented multiple illustrations of colonial and early state legislatures disarming individuals who, like Mr. Cotton, "posed a potential danger" to others. *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012), *abrogated on unrelated grounds by Bruen*, 142 S. Ct. For example, dating back to England in the 17th century, statutes existed in which the government could "seize all arms in the

5

custody or possession of any person" deemed "dangerous to the Peace of the Kingdom." Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13. At the founding of our own Nation, state legislatures disarmed those who posed a danger to society when they engaged in particular conduct. *See, e.g.*, Act for the Punishing of Criminal Offenders, 1692 Mass. Laws 11–12; Act for the Punishing Criminal Offenders, 1696–1701 N.H. Laws 15. And the Government brings forward numerous other examples, such as laws allowing officials to disarm individuals deemed dangerous to society. *See, e.g.*, Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90 (permitting officials to "take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements and Ammunition which they own or possess").

In her dissent in *Range*, Judge Krause provided a thorough examination of similar legislation and statutes that existed from the time of the English Restoration to the ratification of the U.S. Constitution. For example, she discussed the colonies placing restrictions on those who "could not be trusted to obey the law[,]" even on those considered part of the limited body politic at the time. *Range*, 69 F.4th at 122 (Krause, J., dissenting). Revolutionary Virginia disarmed those who would not "abide by the newly sovereign state's legal norms[,]" and the government disarmed those who could not be trusted to abide by the law even here in Pennsylvania. *Id.* at 125 (Krause, J., dissenting). These serve as examples, "consistent with this Nation's historical tradition of firearm regulation[,]" of the disarmament of those with prior convictions who posed a potential danger to society. *See Bruen*, 142 S. Ct. at 2126.

Mr. Range himself had argued that "dangerousness" is the "touchstone" to disarming felons. *See Range*, 69 F. 4th at 104 n.9. Though the majority did "not decide this dispute[,]" *id.*, it did hold that "[f]ounding-era laws often prescribed the *forfeiture of the weapon used to commit a firearms-related weapon* without affecting the perpetrator's right to keep and bear arms generally."

6

*Id.* at 105 (emphasis added). And other judges and justices within the *Range* and *Bruen* majorities have found similarly. *See, e.g., Folajtar v. Att'y Gen.*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting) ("In England and colonial America, the Government disarmed people who posed a danger to others."); *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("The historical evidence does, however, support a different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety.").

Here, Mr. Cotton's prior criminal convictions place him within the category of those who have been disarmed consisted with the Nation's historical tradition. Mr. Cotton was previously convicted of possessing a firearm by a person not to possess a gun. Doc. No. 23 at 4. This demonstrates, at the very least, that he has a history of disobeying firearm regulations specifically designed to protect public safety. Of course, Mr. Cotton was previously convicted of a robbery in which he placed a firearm in the victim's side, stated "this isn't a joke" and took property from that individual. *Id.* at 3. In his instant offense, Mr. Cotton was found with a Glock and an AR-15 style rifle in connection with crack seized from his apartment. *Id.* at 2–3.

Unlike Mr. Range who previously understated his income to qualify for government benefits to feed his family and sought to buy a hunting rifle and potentially a shotgun, Mr. Cotton was previously convicted of robbery and illegal possession of a firearm. In the instant matter, he possessed firearms in connection with a Schedule II drug, and "[d]rugs and guns are a 'dangerous combination.'" *United States v. Blackshear*, No. 23-cr-159, 2023 WL 5985284, at *3 (E.D. Pa. Sept. 14, 2023) (quoting *Smith v. United States*, 508 U.S. 223, 240 (1993)). Mr. Cotton is thus of those "who pose[] a danger to others" and has "demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety." *See Kanter*, 919 F.3d at 454 (Barrett,

J., dissenting); *Folajtar*, 980 F.3d at 913 (Bibas, J., dissenting). Thus, Section 922(g)(1) is constitutional as applied to Mr. Cotton.

Finally, the Government argues that *Range* is "applicable only to the exceptional circumstances of Bryan Range." Doc. No. 23 at 5. And though a future court may relegate *Range* to its factual limits,[2] the Third Circuit precedent, applying the *Bruen* framework, does not pose an insurmountable analytical framework such that the Court cannot apply it to Mr. Cotton's present motion. And Section 922(g)(1) has repeatedly been found to be constitutional on its face. *See, e.g., United States v. Pearson*, No. 22-cv-271, 2023 WL 6216527, at *3 (E.D. Pa. Sept. 25, 2023) ("Section 922(g)(1) is constitutional both on its face and as applied. . . ."). Thus, the Government has met its burden demonstrating that the historical traditions of this Nation render Section 922(g)(1) constitutional on its face and as applied to Mr. Cotton.

Because the Government here has met its burden under *Range* and Mr. Cotton posits no evidence of his *factual* innocence and only his supposed *legal* innocence, the first factor in evaluating a motion to withdraw a guilty plea strongly favors the Government. The strength of Mr. Cotton's reason to withdraw also rests on analyzing *Range*, which does not apply to him for the same reasons; thus, the second factor also weighs in the Government's favor. And because "the Government need not show such prejudice when a defendant has failed to demonstrate that the

---

[2] For example, Judge Pappert recently held that "*Range*'s holding was narrow and limited to the facts of that case, particularly the nature of Bryan Range's previous conviction." *Blackshear*, 2023 WL 5985284, at *2. Furthermore, in the four months since *Range* was decided, district courts within the Third Circuit have increasingly grappled with applying *Range* in similar circumstances. *See, e.g., United States v. Pearson*, No. 22-cr-271, 2023 WL 6216527 (E.D. Pa. Sept. 25, 2023) (Kearney, J.); *United States v. O'Connor*, No. 03-cr-134, 2023 WL 5542087 (W.D. Pa. Aug. 29, 2023) (Conti, J.); *United States v. Minter*, No. 3:22-cr-135, 2023 WL 6051265 (M.D. Pa. Sept. 15, 2023) (Mariani, J.); *Blackshear*, 2023 WL 5985284 (Pappert, J.); *United States v. Ames*, No. 23-cr-178, 2023 WL 5538073 (E.D. Pa. Aug. 28, 2023) (Kenney, J.).

other factors support a withdrawal of the plea," *Jones*, 336 F.3d at 255, and the other two factors weigh in the Government's favor, Mr. Cotton's motion fails.

## CONCLUSION

For the foregoing reasons, Mr. Cotton's motion to withdraw his guilty plea is denied.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE